B. W. Thompson use of Thomas Church, use of Samuel Sankey, now use of C. P. Hewes, Administrator of the Estate of Samuel Sankey, deceased, Appellant, *v.* John Sankey.

*Judgment—Fraud—Priority of lien—Insolvency.*

Where an insolvent purchases land with his own money, and takes the title in the name of his brother, and subsequently pays off a judgment which is a lien upon the land, but instead of having the judgment satisfied of record, has it assigned to his brother, the judgment is fraudulent, and cannot be enforced to the prejudice of other judgment creditors of the insolvent.

Argued May 12, 1896. Appeal, No. 209, Jan. T., 1896, by plaintiff, from order of C. P. Union Co., Sept. T., 1894, No. 62, distributing proceeds of sheriff's sale of real estate. Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL and FELL, JJ. Affirmed.

Exceptions to auditor's report distributing proceeds of sheriff's sale of real estate.

The case was referred to D. W. Cox, Esq., as auditor.

Exceptions to the auditor's report were dismissed, MC-CLURE, P. J., filing the following opinion:

As we have reached the same conclusion as the learned auditor, but by an entirely different route, it is necessary that our reasons be given at some length.

The lands of the defendant sold by the sheriff were advertised as tracts Nos. 8, 9, 10 and 11. Tract No. 8, the tannery property, No. 9, a lot on Walnut street in Mifflinburg, and No. 11, three hundred acres of land in West Buffalo township, were conveyed to Samuel Sankey by B. W. Thompson and others by their deeds dated March 28, 1884. Tract No. 10, situate on

the north side of Mill street, was conveyed to Samuel by John Pontius and wife, by deed dated the 17th day of May, 1866. While the titles to these properties were taken in Samuel's name, John Sankey, his brother, was in possession, leased them, received the rents and exercised other acts of ownership. Notwithstanding the learned auditor has found otherwise, we think it has been clearly shown that John had the equitable title to all these lands. That he paid the purchase money is established by the testimony of George L. Reish, John M. Pontius, John and Jacob Sankey, and there is nothing to the contrary. Hence by the conveyances to Samuel an implied or resulting trust at once arose in favor of John, and his equitable interest was subject to lien, levy and sale by his creditors.

Two days before the death of Samuel, to wit: November 20, 1886, the trust was executed by a conveyance of the legal title to John. That the deed of that date was nothing more than the execution of the trust, and was so intended by the parties, we think is evident. The consideration named therein is the same as the amount paid Thompson, $1,001. While the deed also embraces the Pontius land, the description of that tract was inserted after the conveyance was drawn, but before its execution, and no change was made in the consideration.

It is true two notes were drawn by John one for $500 and the other for $510, but these notes were not kept by Samuel. They were placed in John's safe along with the deed. B. F. Reighard, who was present at the execution of the papers, testifies that the notes were handed to him by Samuel along with the deed. He further says that he didn't know whether he was to retain them or not, but he handed them to Charles Haus, John Sankey's bookkeeper, and told him to put them in John's safe, and that Samuel said to him when he handed him the notes that if he lived the notes would be good, but if he died they would be null and void. Samuel died and the notes were destroyed, we presume, in accordance with the declaration to Reighard. Other than the notes nothing passed from John to Samuel for the conveyance. Why these notes were given at all we are left to conjecture. However, as John had paid for all the land that stood in Samuel's name, we are satisfied that these notes, for whatever else they may have been given, were not to secure purchase money to Samuel, but that the conveyance was an execution of a trust reposed in him.

It follows that if the judgment of Samuel is valid as to cred- itors, being prior to the judgment now held by Emma C. Sankey, it would be the first lien on the land, and his administrator entitled to the proceeds of the sale.

The conveyance, notwithstanding the warranty, being a mere execution of a trust, would not estop him from claiming the fund: Jackson v. Mills, 13 Johns, 463; Jackson v. Hoffman, 9 Cowan, 271; Kelley v. Jenness, 50 Me. 455, sec. 79, Am. Dec. 623; Burchard v. Hubbard, 11 Ohio (O. S.) 316.

It appears that Thompson purchased the lands of John Sankey at a sheriff's sale many years ago, and held them under some arrangement with or trust for him. He also indorsed him in bank and had a judgment, No. 120, May term, 1875, against him as collateral security therefor. March 5, 1880, this judgment was assigned to Thomas Church without consideration and without his knowledge. Church was given to understand by Thompson a day or two afterwards that he was to hold it for his (Thompson's) use and benefit.

In 1884, John, acting under the advice of his brother Samuel, then in San Francisco, compromised with Thompson and paid him $1,001 in satisfaction of his claims. Thompson was to convey the real estate and assign the judgment. The deeds were executed March 28, 1884, and the judgment was assigned May 14 following. There are two versions of this transaction given by the witnesses called by Samuel's administrator. According to John Sankey the $1,001 was paid Thompson by him and this was the entire consideration for the deeds and the transfer of the judgment. If that be true the debt was extinguished, and there was nothing to assign to Samuel as collateral security or for any other purpose. The subsequent revival of the judgment January 8, 1885, by confession, for $6,283.33, whatever effect it might have as to the parties themselves, was void as to existing creditors.

The other version is that given by Jacob Sankey. He says (pp. 21 and 22 of notes) that he and B. W. Thompson were indorsers for John in the Mifflinburg bank for $2,200. (This we understand to be the indorsement for which the Thompson judgment was given as security.) That Thompson surrendered the property and Samuel gave his obligation to the bank, relieving Jacob and Thompson, and John paid it. That John paid

the notes in bank and also paid $1,001 to Thompson for the deed, and that ended the matter.

Hence, according to this witness, it would appear that the $1,001 paid by John Sankey to Thompson was the consideration for the real estate only, and the bank having accepted Samuel's notes in lieu of the notes of John, indorsed by Jacob and Thompson, the collateral judgment was assigned to secure him. But John paid the notes of Samuel at the bank. Why, then, was the collateral judgment revived? This brings us to the same point as the testimony of John Sankey, the defendant, and it seems to us that the actions of these men can be explained on no other reasonable hypothesis than that John was to be held up to the world as a man devoid of property and hopelessly insolvent. What other object could they possibly have had? John was insolvent. Samuel held the legal title to all his real estate. Why he did so has not been satisfactorily explained. The Thompson property is said to have been held as collateral security for the tanning of hides. There is no evidence that any hides were shipped by Samuel to John for that purpose, and what the terms of the contract were is not disclosed. As to the Pontius land no reason at all is given for the conveyance to Samuel. This debt was paid, and, if John Sankey's version be the true one, the judgment was extinguished and there was nothing to assign. Still John accepted service of a scire facias issued thereon by the assignee, Samuel, and voluntarily confessed judgment for over $6,000. We think the conclusion is not unwarranted, that it was by the collusion of the parties and for the purpose of hindering and delaying the creditors of John. We are therefore of the opinion that this judgment of Samuel should not be permitted to participate in the funds arising from the sale of John's real estate.

Considerable testimony has been taken attacking the judgment of J. W. Sankey, now held by his daughter, Emma. Conceding that the judgment is in excess of the amount due by John, and that he has been overreached by his brother, the plaintiff, we think no collusion has been shown between John and J. W. in the entry or revival of the judgment. It was revived adversely and by the verdict of a jury. Without collusion the judgment was binding on the auditor and there was no error in awarding the plaintiff the fund. Of the many authorities sus-

taining this position we will cite but two: Sheetz v. Hanbest's Exr., 81 Pa. 100, and Meckley's Appeal, 102 Pa. 536.

And now, to wit: October 25, 1895, the exceptions to the sheriff's special return filed by C. P. Hewes, administrator of Samuel Sankey, deceased, are dismissed; the second exception to the said return filed by Emma C. Sankey is sustained; the report of the auditor is confirmed and the proceeds of the sale, less the costs of audit, are ordered and directed to be paid to Emma C. Sankey, plaintiff in judgment No. 35, March term, 1892.

C. P. Hewes, administrator of Samuel Sankey, deceased, appealed.

*Error assigned* was above order.

*Charles J. Reilly* and *Samuel H. Orwig*, for appellant. —Upon distribution of the proceeds of a sheriff's sale a subsisting judgment can only be attacked by other creditors collaterally on the ground of collusion: Dougherty's Est., 9 W. & S. 189 ; Lewis v. Rogers, 16 Pa. 18; Thompson's App., 57 Pa. 175; Clark v. Douglass, 62 Pa. 408; Sheetz v. Hanbest's Exr., 81 Pa. 102.

The presumption which is ever ready to arise in favor of innocence requires that fraud, to be believed, be first proved: Shoemaker v. Kunkle, 5 Watts, 108 ; Mead v. Conroe, 113 Pa. 220 ; Bear's Est., 60 Pa. 430; Young v. Edwards, 72 Pa. 257.

*Andrew A. Leiser, Erwin M. Beale* with him, for appellee.— John Sankey having paid the Thompson judgment and being insolvent, its assignment to Samuel Sankey was fraudulent and void: Cadogan v. Kennett, 2 Cowp. 432; Clements v. Moore, 6 Wall. 299; McCulloch v. Hutchinson, 7 Watts, 434; Bump on Fraudulent Conveyances, 22; 8 Am. & Eng. Ency. of Law, 753; Bentz v. Rockey, 69 Pa. 71; Serfoss v. Fisher, 10 Pa. 184; Bunn, Raiguel & Co. v. Ahl, 29 Pa. 387.

Samuel Sankey being party to the fraud his administrator is estopped as to John Sankey's creditors: Murphy v. Hubert, 16 Pa. 50; Gill v. Henry, 95 Pa. 388; Bonesteel v. Sullivan, 104 Pa. 9; Allebach v. Hunsicker, 132 Pa. 349; Winton v. Freeman, 102 Pa. 366; Hershey v. Weiting, 50 Pa. 240; Evans v. Dravo, 24 Pa. 62; French v. Mehan, 56 Pa. 286; Bump on Fraudulent Conveyance, 457.

If the plaintiff in the judgment becomes the owner of the land upon which the judgment is a lien, the lien becomes extinct by operation of law : Koons v. Hartman, 7 Watts, 20 ; Wright v. Knepper, 1 Pa. 361 ; Skinner v. Starner, 24 Pa. 123 ; Dentler's App., 23 Pa. 505.

PER CURIAM, May 25, 1896 :

We find no error in this record. The questions involved have been fully considered and correctly decided by the learned president of the common pleas ; and there appears to be nothing in any of them that requires further discussion. The decree is affirmed on the opinion of the court below, and the appeal is dismissed at the costs of the appellant Charles P. Hewes, administrator, etc.