## Shuster *v.* Barkus et ux., Appellants.

Argued March 20, 1963. Before RHODES, P. J., ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ.

reargument refused May 10, 1963.

*Anthony L. V. Picciotti,* with him *Alfeo P. Libetti,* for appellants.

*Ronald N. Rutenberg,* with him *Harry A. Rutenberg,* for appellee.

OPINION BY ERVIN, J., April 18, 1963:

We are here concerned with a dispute over the distribution of the proceeds of a sheriff's sale of real estate on a writ of fieri facias.

On June 8, 1959 a judgment was entered by Liberty Real Estate Bank & Trust Company (hereinafter called "bank"), against Albert Barkus, Annette Barkus and Charles Barkus, and damages were assessed in the sum of $3,722.60. On June 19, 1959 a second judgment was entered by Herman Shuster against Albert Barkus and Annette Barkus and damages were assessed in the sum of $3,455.00. The bank loan became in default and the bank sold its judgment on December 8, 1959 to James Mathewson, Esquire, who on the same date had the bank judgment marked to the use of Sarah Steinberg, a straw person. On December 9, 1959 Mathewson issued a writ of fieri facias returnable to the first Monday of January 1960 for execution against premises 6329 Fariston Drive. Mathewson notified the Barkuses that there would be a sheriff's sale of their Fariston Drive property and the Barkuses brought Mathewson's letter to their attorney, John M. McAllister. McAllister made arrangements with an Anthony DiBenedetto to borrow the sum of $4,000.00 to pay off the bank judgment but DiBenedetto could not produce the

money until after the middle of January 1960. Mc-Allister endeavored to get Mathewson to postpone the sale but was advised by Mathewson that his client would not permit any postponement and that the money had to be paid before the sale date. McAllister then advised a friend of his by the name of Edward Holland of his client's (the Barkuses) situation. Holland temporarily loaned the sum of $3,300.00 to McAllister to save the day. McAllister, on January 8, 1960, paid this sum of money in cash to Mathewson and in addition thereto gave his own personal check in the sum of $60.80 to Mathewson and Mathewson on the same date stayed the sale on the writ which had issued under the bank judgment. McAllister on the same date, January 8, 1960, had the bank judgment marked to his own use (John M. McAllister, Esquire).

Anthony DiBenedetto testified that on January 26, 1960 he received from Michael Scutti a check for $4,-500.00 and he produced a bank deposit slip to show the deposit of this check in the bank on the same date. He also testified that on January 26, 1960 he gave a check on his agency account to McAllister in the sum of $4,-000.00 for the purpose of acquiring the bank judgment. McAllister corroborated this testimony. It is clear from the evidence that DiBenedetto was looking to the bank judgment as security for the repayment of this money. Of the $4,500.00 obtained from Scutti, DiBenedetto took $500.00 as a fee for his services to Scutti. With the money received from DiBenedetto, McAllister repaid Holland the money temporarily borrowed from him and the balance of the $4,000.00, to wit, $700.00, he turned over to his clients, the Barkuses, and the Barkuses in turn out of this money repaid McAllister the $60.80 which McAllister had paid to Mathewson.

DiBenedetto also testified that he received payments from the Barkuses in liquidation of the indebtedness

as follows: $90.00 on February 26, 1960; $90.00 on April 7, 1960; $90.00 on April 30, 1960; $90.00 on May 23, 1960; $90.00 on July 15, 1960 and $100.00 on January 11, 1961. DiBenedetto also testified that he set up the payment schedule after visiting the Barkuses and left with them a payment book and card. He also testified that he remitted these payments to Mr. Scutti.

On April 3, 1961 the 6329 Fariston Drive property was sold pursuant to a writ of fieri facias issued on the Shuster judgment. The schedule of proposed distribution arising from this sheriff's sale showed the bank judgment which had been marked to the use of John M. McAllister, Esquire, as a lien prior to the Shuster judgment. Shuster filed exceptions to the proposed schedule of distribution and the money was paid into court for disposition. On April 12, 1961 McAllister marked the bank judgment to the use of Norma Kahn, who was a straw person for Scutti.

All of the above appears from the depositions taken in this case.

The court below sustained the exceptions filed by Herman Shuster and awarded the proceeds of the sale to him.

The rationale of the opinion of the court below is that McAllister was the attorney for the Barkuses and that he was paying their money to Mathewson and that the bank judgment was thereby extinguished. There can be no question but that the holder of a junior lien already of record may take advantage of the partial or total payment of a prior lien: *Thompson v. Sankey,* 175 Pa. 594, 34 A. 1104; *Fair and Square B. & L. v. Pres. Board of Publication,* 302 Pa. 162, 153 A. 341; *Tesauro v. Calitri,* 153 Pa. Superior Ct. 156, 33 A. 2d 36.

Mr. Justice Paxson said in *Loverin, Hall & Co. v. Humboldt Safe Deposit & Trust Co.,* 113 Pa. 6, 4 A. 191 (quoted with approval in *Weir v. Potter T. & M. Guarantee Co.,* 323 Pa. 212, 185 A. 630) : "Though

actual payment discharges a judgment or other encumbrance at law, it does not discharge it in equity if there are interests which require it to be kept alive for their protection . . . . When the mortgagors procured the payment of the first mortgage with what was admittedly their own money, it extinguished that mortgage at law and in equity as between it and the second mortgage, and the latter took its place. *We do not deny the right of the mortgagors to have procured some friend to have bought the mortgage and taken an assignment of it. Such a transaction would have been legal and would have kept it alive.* But when they procured it to be done with their own money, the assignment of the mortgage is of no validity as against the younger mortgage." (Emphasis added)

In the *Weir* case, the court also cites, at pages 221, 222, the following quotation from 41 C.J., page 787: " 'A mortgage may be kept alive to secure an indebtedness distinct from that which it was originally made to secure. This rule applies also to one who advances to the mortgagor the money necessary to pay the mortgage debt under an agreement that he shall have the benefit of the mortgage security for his own reimbursement.' " An examination of the testimony taken in the depositions will reveal that to have been done in the present case.

Mr. John M. McAllister, attorney for the Barkuses, testified as follows: "The only interest I had in the judgment was to make sure that the person who was going to advance the $4000 would be protected. That person would be Anthony DiBenedetto." At another place he testified: "It was further agreed that I would have the judgment assigned to me and then assign it to either Mr. DiBenedetto or his nominee." He also testified as follows: "By way of further explanation of the judgment note I explained to Mr. DiBenedetto it wasn't necessary to have a new judgment note since

in fact I had the judgment and it was going to be assigned to him. However, he felt better protected by his having an additional one. Later I subsequently did assign that judgment that was assigned to me to Mr. DiBenedetto's nominee."

Anthony DiBenedetto testified as follows: "I don't remember the exact words, but they were to the effect that there was a note on record in favor of the Liberty Real Estate Bank and Trust Company against Albert and Annette Barkus and Charles Barkus, who I believe was a brother of Albert Barkus. It appeared as a first loan after a mortgage on 6329 Fariston Drive, the home of Albert Barkus. He asked me to ascertain, and on behalf of another client I did ascertain that this property was worth approximately $13,000. There was a first mortgage on it the balance of which was approximately $9,000, and I had assumed that this note would be marked for the use of either my client or myself. This note is recorded in M.C., June 1959, 929." He further testified: "I said we were going to assume the assignment of the note already recorded. Q. You assumed you would get such an assignment; is that right? A. Yes. Q. You assumed you would get a judgment note in the sum of $4,000; is that correct? A. No. Q. What else did you assume you would get? A. I assumed we would take marked to our use the note that was already recorded in favor of the Liberty Real Estate Bank and Trust Company that was approximately $3,200, $3,300."

This evidence is quite clear that at the time the money was loaned by DiBenedetto for his client Scutti, an agreement had been made that the bank judgment was to be marked to his use or the use of a nominee for the protection of the loan which he was then making. The court below was skeptical of the fact that the bank judgment was not marked to the use of DiBenedetto or the straw person, Norma Kahn, until a num-

ber of months after the loan of the money and also after the sheriff's sale. This delay, however, is explained by DiBenedetto as follows: "I didn't think it was absolutely mandatory that the note be marked to the use of my client. I have sufficient faith in Mr. McAllister. I knew he was working on my behalf, that the note was ample security and could be transferred at any time." It is, therefore, quite clear that the Barkuses were not paying off the bank judgment with their own money but were doing so with money borrowed for that purpose from Mr. DiBenedetto and his client, Scutti. It is quite clear that the bank judgment was to be marked to the use of the lender to give him security for the repayment of this loan.

In the language of Mr. Justice PAXSON hereinbefore quoted, this appears to be a case where equity would require the bank judgment to be kept alive for the protection of the lender. No evidence has been produced to show that this was done for the purpose of hindering, delaying or defrauding other creditors. Had it not been done, the bank judgment would have been foreclosed in the first instance and the Shuster judgment would have been discharged. The new money coming in from the third person prevented that from happening and the lender should not now be punished for his action in so doing.

Order reversed.